## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

KRIS MARCHELLE PARMER,

                  Plaintiff,

v.

EXPERIAN INFORMATION
SOLUTIONS, INC., EQUIFAX
INFORMATION SERVICES, LLC,
TRANS UNION LLC, AFFIRM, INC.,
UPLIFT, INC.,

                  Defendants.

Case No.: 5:24-cv-00538

**JURY TRIAL DEMANDED**

## COMPLAINT

Kris Marchelle Parmer ("Plaintiff" or "Ms. Parmer") brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax"), Trans Union LLC, ("Trans Union"), (collectively, "Credit Bureau Defendants") and Affirm, Inc. ("Affirm") and Uplift, Inc. ("Uplift") (collectively "Defendants") and states as follows:

### INTRODUCTION

1.    Plaintiff, an identity theft victim, brings this action against Defendants for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et. seq.

2.    More than twenty million people, just under 10% of all adult

Americans, are victims of identity theft each year.[1] Federal Law requires that each consumer reporting agency ("CRA") protect victims by taking steps to remove fraudulent information from victims' reports, to ensure that only third parties with permissible purposes see victims' reports and to implement fraud alerts and security freezes at victims' requests.  This lawsuit arises from Defendant's refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and identity theft consequences.

3.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

4.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever

---

[1] Victims of Identity Theft, 2018, 1. U.S. Dept. of Justice, Bureau of Justice Statistics.  April 2021, NCJ 256085.

inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

5.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

7.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

8.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

9.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer

disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

11. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U. S.C. § 1681(a)(4).

12. The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

13. Plaintiff's claims arise out of the Defendants plainly deficient reinvestigations considering Plaintiff's multiple disputes and repeated notice that she was a victim of identity theft.

14. Accordingly, Plaintiff brings claims against the CRA Defendants, for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff

disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i, and for failing to block the identity theft items as disputed and supported by Plaintiff in violation of the FCRA, 15 U.S.C. § 1681c-2.

15.     Further, Plaintiff also brings claims against the Furnishers, Defendant Affirm and Defendant Uplift, for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiff's credit file, in violation of FCRA, 15 U.S.C. § 1681s-2b.

16.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., as described herein.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. See 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)

because Defendants regularly transacts business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## **PARTIES**

19.     Kris Marchelle Parmer ("Plaintiff" or "Ms. Parmer") is a natural person residing in Howey-in-the-Hills, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

20.     Defendant Equifax Information Services, LLC ("Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Florida, including within this District. Equifax can be served through its registered agent Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Coners, GA 30092.

21.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d)) to third parties.

22.     The information that Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245

million Americans.  Equifax also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

23.     Equifax collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether Equifax collects and maintains information about them.  Not only that, but consumers cannot remove information that Equifax collects and maintains about them from the Equifax database.  Further, Equifax sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Equifax sold.

24.     Defendant Experian Information Solutions, Inc. ("Experian") is a corporation with a principal place of business located at 475 Anton Boulevard Costa Mesa, California, and is authorized to do business in the State of Florida, including within this District. Experian can be served through its registered agent CT Corporation System, 330 North Brand Blvd., Glendale, CA 91203.

25.     Defendant Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

26.     The information that Defendant Experian collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Experian also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

27.     Defendant Trans Union LLC ("Trans Union") is a corporation with a principal place of business located at 555 West Adams Street, Chicago, IL 60661, and is authorized to do business in the State of Florida, including within this District. Trans Union can be served through its registered agent Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

28.     Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

29.     The information that Defendant Trans Union collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Trans Union also collects consumers'

personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

30.    Defendant Affirm, Inc. ("Affirm") is a corporation with a principal place of business located at 650 California Street, FL 12, San Francisco, CA 94108, and is authorized to do business in the State of Florida, including within this District. Affirm can be served through its registered agent CT Corporation, 1200 South Pine Island Rd., Plantation, FL 33324.

31.    Affirm is a "Furnisher" as defined in 12 CFR 1022.41. Affirm regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report.   A data furnisher, such as Affirm, is an entity that reports information about consumers to consumer reporting agencies (CRAs), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc.   Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

32.    Defendant Uplift, Inc. ("Uplift") is a corporation with a principal place of business located at 275 Battery Street, Suite 2300, San Francisco, CA 94111, and is authorized to do business in the State of Florida, including within this District. Uplift can be served through its registered agent CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.

33.     Uplift is a "Furnisher" as defined in 12 CFR 1022.41. Uplift regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report.   A data furnisher, such as Uplift, is an entity that reports information about consumers to consumer reporting agencies (CRAs), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc.  Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

34.     The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

35.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See 15 U.S.C. § 1681(a).

36.     Specifically, the statute was intended to ensure that "consumer

reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  See 15 U.S.C. § 1681(b).

37.    Congress also recognized that CRAs such as Equifax and Trans Union "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers."    15 U.S.C. § 1681(a)(3).    Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."   15 U.S.C. § 1681(a)(4).

38.    For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

39.    The first form of protection is the "block."  When a consumer identifies any information in their credit file that is the product of identity theft, the CRA must block (delete) the reporting of that information within four business days, provided the consumer submits:

a.    Appropriate proof of the identity of the consumer;

b.    A copy of an identity theft report;

c.    The identification of such information by the consumer; and,

d.    A statement by the consumer that the information is not

information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).15 U.S.C. § 1681c-2(a).

40.     The second form of protection the FCRA provides for identity theft victims is the "fraud alert."

41.     Specifically, upon request of the consumer, a CRA must place an "initial fraud alert" in the file of that consumer and provide that alert along with any credit score generated in using that file, for one year beginning on the date of the request.  Unless one year has passed, the CRA can only remove the alert if the consumer requests removal and the CRA receives "appropriate proof of the identity of the requester." 15 U.S.C. § 1681c-1(a)(1).

42.     The third form of protection the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as the Credit Bureau Defendants here.

43.     A security freeze prohibits a CRA from disclosing the contents of a consumer report that is subject to the freeze to any person requesting the consumer report.[2] 15 U.S.C. § 1681c-1(i)(1).  Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

---

[2] Certain statutorily exempt entities can still request and receive a frozen report.  See 15 U.S.C. § 1681c-1(i)(4).  But those exemptions do not apply to the matter at hand.

44.     Once placed, a security freeze does not expire.  A CRA can remove a security freeze **only** at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of fact by the consumer." 15 U.S.C. § 1681c-1(i)(3)(A).  Furthermore, when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze."  15 U.S.C. § 1681c-1(i)(3)(C).

45.     The fourth and final form of protection the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may only release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may **only** release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit.  15 U.S.C. § 1681b(c).  No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose.  15 U.S.C. § 1681e(a).

46.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting

agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

47.     Similarly, the FCRA also imposes a duty upon the Furnishers, such as Affirm and Uplift, to reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies. (15 U.S.C. § 1681s-2b).

48.     The FCRA provides consumers with a private right of action against consumer reporting agencies, such as the CRA Defendants, and data furnishers such as Affirm and Uplift, that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## FACTUAL ALLEGATIONS
### Identity Theft

49.     In or around February 2024, Plaintiff received a credit monitoring alert that an account on her credit report(s) has been reported with a late payment. Immediately after receiving the alert, Plaintiff requested and obtained her credit reports from the Credit Bureau Defendants and, upon review, saw that fraudulent accounts were reporting to her consumer files and reports.

50.     Upon review of her Experian credit report, Plaintiff discovered a late payment associated with an Affirm account, Account JFEIXXXX, opened on October 12, 2023 ("Affirm Account"), being reported.

51.     Plaintiff was confused and upset because she did not open the Affirm account.

52.     Upon review of her Equifax credit report, Plaintiff discovered an Uplift Inc. account, Account *1063, opened on October 10, 2023 ("Uplift Account"), that she did not recognize.

53.     Plaintiff initially thought the Affirm Account and the Uplift Account were the same account because they were opened around the same date.  As such, Plaintiff initially focused her efforts only on the Affirm account.

54.     On or about February 23, 20024, Plaintiff called Affirm multiple times to request information concerning Affirm Account that was appearing on her credit file.  The representatives she spoke with told her there were no accounts associated with her name, address, email and/or telephone number.

55.     Plaintiff did not initiate, authorize, or benefit from the fraudulent accounts.

56.     On February 23, 2024, fearing that her identity had been stolen, Plaintiff filed an FTC Identity Theft Report regarding the fraudulent accounts.  Since at the time Plaintiff believed that Affirm and Uplift were one in the same, she only noted Affirm on the February 2024 FTC Affidavit.

**Plaintiff's Dispute to the CRA Defendants February 2024 and March 2024**

57.     Concerned that Defendant Affirm and Uplift would continue to report inaccurately to the one or more consumer reporting agencies that Plaintiff was responsible for the fraudulent accounts, Plaintiff determined that she needed to

escalate the issue to prevent further damage to her credit files and reports.

58.    Between February 23, 2024, and March 18, 2024, Plaintiff disputed the fraudulent accounts with the Defendants Experian and Equifax multiple times via online. Specifically, Plaintiff disputed that the fraudulent accounts were not hers, but rather the product of fraud and identity theft.

59.    Plaintiff provided sufficient information to identify her credit file.

60.    Plaintiff requested that the identity theft information be blocked from her credit file.

61.    At the time of her disputes to Defendants Experian and Equifax, Defendant Trans Union was not reporting either fraudulent account.

### Defendant Experian's Unreasonable Dispute Reinvestigation February 2024 and March 2024

62.    On or about February 23, 2024, Defendant Experian received Plaintiff's dispute and request that identity theft information be blocked from her credit file.

63.    Upon information and belief, Defendant Experian sent Defendant Affirm an automated credit dispute verification ("ACDV") pursuant to Plaintiff's February 2024 dispute to Defendant Experian.

64.    Defendant Affirm received Defendant Experian's ACDV and did not adequately reinvestigate Plaintiff's dispute.

65.    On March 1, 2024, Defendant Experian issued dispute results to Plaintiff wherein it communicated that the disputed information was verified as

accurate and would remain in her credit file.

66. On March 15, 2024, Plaintiff received another dispute response from Experian wherein it communicated that the Affirm Inquiry dated October 10, 2023, would be deleted from her Experian credit report.

67. On March 18, 2024, Plaintiff received notice of a dispute result from Defendant Experian, but she was unable to access the results online.

68. On April 5, 2024, Plaintiff received an additional dispute response from Experian again stating that the Affirm account was verified as accurate and would remain on her Experian credit report.

69. Defendant Experian failed to adequately review all of the information provided to it by Plaintiff.

70. Defendant Experian failed to reinvestigate Plaintiff's February and March 2024 disputes and failed to block the identity theft information.

71. Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

72. Defendant Experian violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

**Defendant Equifax's Unreasonable Dispute Reinvestigation
February 2024 and March 2024**

73.     On or about February 23, 2024, Defendant Equifax received Plaintiff's dispute and request that identity theft information be blocked from her credit file.

74.     Defendant Equifax sent Defendant Uplift an automated credit dispute verification ("ACDV") pursuant to Plaintiff's February 2024 dispute to Defendant Equifax.

75.     Defendant Uplift received Defendant Equifax's ACDV and did not adequately reinvestigate Plaintiff's dispute.

76.     On March 15, 2024, Defendant Equifax issued dispute results to Plaintiff wherein it communicated that the disputed information was verified as accurate.

77.     Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff.

78.     Defendant Equifax failed to reinvestigate Plaintiff's February 2024 and March 2024 disputes and failed to block the identity theft information.

79.     Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

80.     Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the

reporting of the disputed information which was due to identity theft from Plaintiff's file.

### Plaintiff Requests her Credit Reports April 2024

81.    In April 2024, Plaintiff frustrated that she was not able to get the fraudulent accounts removed from her Experian and Equifax credit files, hired legal representation to assist her.

82.    On or about April 8, 2024, Plaintiff obtained her credit reports from annualcreditreports.com for all three Credit Bureau Defendants.

83.    Upon review of her Experian credit report, Plaintiff discovered that Experian continued to report the Affirm Account.

84.    Upon review of her Equifax credit report, Plaintiff discovered that Equifax continued to report the Uplift Account.  Additionally, Equifax reported two soft inquiries from Uplift dated October 10, 2023.

85.    As of April 2024, Trans Union was not reporting either the Affirm Account or Uplift Account.

86.    On April 12, 2024, Plaintiff now realizing that Affirm and Uplift are two separate accounts filed an FTC Affidavit identifying both the Affirm and Uplift accounts, as well as the corresponding inquiries.

87.    On or about April 20, 2024, Plaintiff received notification from Credit Karma that stated a new Uplift account had been added to her Trans Union report.

88.    On or about June 7, 2024, Plaintiff filed a police report with the Howey-in-the-Hills Police Department stating that she was the victim of identity theft and identifying both the Affirm and Uplift accounts as being fraudulently opened as the product of the identity theft.

## Plaintiff's Dispute to the CRA Defendants
## March 2024

89.    On or about April 23, 2024, Plaintiff disputed via certified mail the Affirm Account with Defendant Experian and the Uplift Account with Defendants Equifax and Trans Union.

90.    Plaintiff's April 2024 dispute included a copy of the April 2024 FTC Fraud Affidavit, a copy of her driver's license and social security card to identify her and a copy of a recent utility bill to verify her address.

## Defendant Experian's Unreasonable Dispute Reinvestigation of
## Plaintiff's April 2024 and June 2024 Disputes

91.     On or about April 23, 2024, Defendant Experian received Plaintiff's dispute and request that identity theft information be blocked from her credit file.

92.    On May 6, 2024, Defendant Experian sent Plaintiff a letter acknowledging her April 2024 dispute but refusing to reinvestigate because it believed the letter came from an unauthorized third party.

93.     On June 11, 2024, Plaintiff again disputed the Affirm account to Defendant Experian via certified mail and again included proof of her identity and

address as well as the April 2024 FTC Fraud Affidavit.  Plaintiff also included a copy of her June 2024 Police Report.

94.    On or about June 11, 2024, Defendant Experian received Plaintiff's dispute and request that identity theft information be blocked from her credit file.

95.    Upon information and belief, Defendant Experian sent Defendant Affirm an automated credit dispute verification ("ACDV") pursuant to Plaintiff's June 2024 dispute to Defendant Experian.

96.    Defendant Affirm received Defendant Experian's ACDV and did not adequately reinvestigate Plaintiff's dispute.

97.    In a dispute response dated July 9, 2024, Experian stated that Affirm and Uplift accounts were verified as accurate and would remain on her Experian credit reports.  Instead of removing the fraudulent Affirm account in response to Plaintiff's disputes, Defendant Experian added the fraudulent Uplift account.

98.    Shortly after receiving the July 9, 2024, dispute results from Experian Plaintiff reviewed her Experian credit report dated July18, 2024, which included both the Affirm and Uplift fraudulent accounts.

99.    Defendant Experian failed to reinvestigate Plaintiff's April 23, 2024, or June 11, 2024, disputes and failed to block the identity theft information.

100.    Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review

all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

101.   Defendant Experian violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

### Defendant Equifax's Unreasonable Reinvestigation of Plaintiff's April 2024 and June 2024 Disputes

102.   On or about April 23, 2024, Defendant Equifax received Plaintiff's dispute and request that identity theft information be blocked from her credit file.

103.   Upon information and belief, Defendant Equifax sent Defendant Uplift an automated credit dispute verification ("ACDV") pursuant to Plaintiff's April 2024 dispute to Defendant Equifax.

104.   Defendant Uplift received Defendant Equifax's ACDV and did not adequately reinvestigate Plaintiff's dispute.

105.   On or about May 9, 2024, Plaintiff received a dispute response from Equifax that acknowledged her block request but declined to block the disputed information as the product of identity theft.  Defendant Equifax further stated that it contacted the companies that provided the disputed information to verify the information.

106.   On May 25, 2024, Plaintiff received a dispute response from Defendant Equifax stating that the Affirm account was not currently being reported by Equifax

and that the Uplift account was verified as accurate and would continue to be reported by Equifax.

107.   On or about June 11, 2024, Plaintiff again disputed to Defendant Equifax via mail and again included proof of her identity and address as well as the April 2024 FTC Fraud Affidavit.  Plaintiff also included a copy of her June 2024 Police Report.

108.   On or about June 26, 2024, Plaintiff received a dispute response from Defendant Equifax again acknowledging Plaintiff's request to block the fraudulent account information from her credit file.  Equifax again stated that it would not block but would ask the companies that provided the disputed information to verify the information.

109.   Upon information and belief, Defendant Equifax sent Defendant Uplift an automated credit dispute verification ("ACDV") pursuant to Plaintiff's June 2024 dispute to Defendant Equifax.

110.   Defendant Uplift received Defendant Equifax's ACDV and did not adequately reinvestigate Plaintiff's dispute.

111.   On or about July 15, 2024, Plaintiff received a dispute response from Defendant Equifax again stating that the Affirm account was not being reported by Equifax and that the Uplift account had been verified as accurate and would remain on her credit report.

112.   On or about August 22, 2024, Plaintiff checked her Equifax credit report using Credit Karma.

113.   Upon reviewing her August 22, 2024, Equifax credit report, Plaintiff discovered that the Uplift account on the Equifax report is now showing a zero balance; however, there is now a Jefferson Capital collections account reporting $3,433.00 owed with the original creditor listed as Uplift, Inc.

114.   Defendant Equifax failed to reinvestigate Plaintiff's April 23, 2024 or June 11, 2024 disputes and failed to block the identity theft information.

115.   Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

**Defendant Tran Union's Unreasonable Dispute Reinvestigation
April 2024 and June 2024**

116.   On or about May 2, 2024, Plaintiff received a letter from Trans Union which acknowledged her dispute, but refused to investigate her dispute because it did not believe the dispute was authorized by Plaintiff.

117.   On or about June 11, 2024, Plaintiff disputed again with Defendant Trans Union via mail.

118.   Plaintiff again included in her June 11, 2024, dispute, Plaintiff's April 2024 FTC Fraud Affidavit, a copy of her driver's license and social security card to identify her and a copy of a recent utility bill to verify her address.  Plaintiff also included a copy of her June 2024 Police Report.

119.   Upon information and belief, Defendant Trans Union sent Defendant Uplift an automated credit dispute verification ("ACDV") pursuant to Plaintiff's June 2024 dispute to Defendant Trans Union.

120.   However, the Fraudulent Account was not removed or blocked from her credit file.

121.   Upon information and belief, Defendant Upstart received Defendant Trans Union's ACDV and did not adequately reinvestigate Plaintiff's dispute.

122.   On or about July 13, 2024, Plaintiff received a dispute response from Defendant Trans Union stating that Trans Union had verified that the Uplift account was accurate and would continue to report.

123.   On July 31, 2024, Plaintiff received a Credit Karma alert that a Jefferson Capital Systems collection account had been added to Plaintiff's Trans Union credit report.  The original creditor is Uplift.

124.   Defendant Trans Union failed to reinvestigate Plaintiff's April 23, 2024, or June 11, 2024, disputes and failed to block the identity theft information.

125.   Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct

a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

126.   Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

**The Credit Bureau Defendant' Method for Considering
Consumer Credit Report Disputes**

127.   The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

128.   The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance.  e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

129.   That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."

130.   It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

27

131.   Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

132.   Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

133.   The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

134.   These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

135.   Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

136.   The data furnishers, like Defendants Affirm and Uplift, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. §

1681s-2(b).

137.   Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendants Affirm and Uplift's Unreasonable Dispute Investigation**

138.   On April 10, 2024, Plaintiff called Affirm directly again.  The Affirm representative confirmed that Plaintiff's name and address were associated with the Affirm account; however, there was a different telephone number and email address than Plaintiff's associated with the account. The Affirm representative refused to provide additional information unless Plaintiff could provide the telephone number and email address used to open the account.  Since Plaintiff was the victim of identity theft, and did not open the account, Plaintiff does not know the telephone number or email address the identity thief used.  Therefore, the Affirm representative would not provide Plaintiff with additional information.

139.   In April 2024, Plaintiff learned that Uplift was a different account than Affirm.

140.   On April 10, 2024, Plaintiff reached out to Uplift.  The representative at Uplift confirmed that Plaintiff's name, address, last four of her social security

number and date of birth match the account, but there is a different telephone number and email associated with the account.

141.   Upon information and belief, Defendants Affirm and Uplift failed to adequately review all of the information provided to it by Plaintiff.

142.   Upon information and belief, Defendants Affirm and Uplift verified the disputed information as accurate in response to Credit Bureau Defendants' ACDVs.

143.   Upon information and belief, Defendant Affirm verified the disputed information as accurate in response to Defendant Experian's ACDV.

144.   Upon information and belief, Defendant Uplift verified the disputed information as accurate in response to Defendant Experian, Equifax, and Trans Union's ACDVs.

145.   Defendants Affirm and Uplift violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed fraudulent accounts were the product of identity theft.

## PLAINTIFF'S DAMAGES

146.   In April 2024, Plaintiff needed to but new windows for her two-story home.  Plaintiff has children and several of the windows are inoperable posing a safety hazard.  Plaintiff originally intended on financing the windows which cost approximately $32,000.00.

147.   Due to the fraudulent accounts on her credit reports Green Sky denied Plaintiff a loan for windows.

148.   Plaintiff was forced to pay for the windows in full and in order to be able to do so she had to take the money out of her 401k which Plaintiff had to pay interest on.

149.   Plaintiff also lost the interest that the 401k proceeds would have earned if the proceeds had remained in her 401k.

150.   Plaintiff also had her Capital One credit line reduced.  Due to an error that occurred when Plaintiff upgraded her BJ's Wholesale Membership card, Capital One was unable to reinstate Plaintiff's previous line of credit.  Capital One had to submit a request for credit which resulted in Plaintiff's credit line being lowered due to the Fraudulent Accounts reporting on her credit reports.

151.   Having her Capital One line reduced caused Plaintiff to be embarrassed and frustrated.  The derogative fraudulent accounts that are the product of identity theft being reported on her credit reports is reducing Plaintiff's credit and affecting her debt to credit ratio.

152.   Additionally, Plaintiff wants to do a Home Equity Loan but is holding off because she does not believe she will be approved with the derogatory fraudulent accounts on her credit reports.

153.   Moreover, Plaintiff's car lease ends in November and she fears that she

won't be able to secure a new lease with the derogatory accounts on her credit reports.

154.   Further, Plaintiff suffers from anxiety. Plaintiff's stress caused by being the victim of identity theft and having derogatory accounts on her credit files has caused her anxiety to increase.

155.   Plaintiff did exactly what she should have done upon realizing she was the victim of identity theft.

156.   Plaintiff disputed directly with Defendants Affirm and Uplift on multiple occasions and explained that the fraudulent accounts were fraudulently opened and that she was the victim of identity theft.

157.   Plaintiff filed two FTC ID Theft Reports.

158.   Plaintiff filed a Police Report.

159.   Plaintiff disputed with the Credit Bureau Defendants multiple times throughout 2024.

160.   Plaintiff immediately identified herself as an identity theft victim and requested that the Credit Bureau Defendants block the account information that was the product of identity theft.

161.   The Credit Bureau Defendants failed to block the fraudulent accounts that were the product identity theft despite Plaintiff's multiple disputes.

162.   Instead,   the   Credit   Bureau   Defendants   repeatedly   disregarded

Plaintiff's credible disputes.  Often responding to a victim of identity theft that the furnisher of the account that was the product of identity theft had verified the account as accurate.

163.   The Credit Bureau Defendants understand it is often the case that an identity thief's activities, often designed intentionally to fabricate information into a credit file, will cause false information to appear on an identity theft victim's credit file.

164.   Despite Plaintiff's multiple disputes to the Credit Bureau Defendants that the Affirm and Uplift accounts were the product of fraud, and she was a victim of identity theft, Defendants Equifax, Experian, and Trans Union hardly waivered in their refusals to block the information.

165.   Plaintiff reasonably believes that Defendants Affirm and Uplift verified the fraudulent accounts as accurate to Defendants Experian, Equifax, and Trans Union inaccurately suggesting that Plaintiff was responsible for the fraudulent accounts.

166.   As a direct result of Defendant Experian's ardent refusal to block the fraudulent Affirm and Uplift accounts, which were the product of identity theft, Defendant Experian has continued to saddle Plaintiff with accounts that were the product of identity theft.

167.   As a direct result of Defendant Equifax's ardent refusal to block the

fraudulent Uplift Account, which was a product of identity theft, Defendant Equifax has continued to saddle Plaintiff with an account that was the product of identity theft.

168. As a direct result of Defendant Trans Union's ardent refusal to block the fraudulent Uplift Account, which was a product of identity theft, Defendant Trans Union has continued to saddle Plaintiff with an account that was the product of identity theft.

169. Further, as a direct result of Defendants Affirm and Uplift's verification of the disputed fraudulent accounts to Defendants Experian, Equifax, and Trans Union, Defendants Affirm and Uplift have continued to saddle Plaintiff with accounts which were the product of identity theft.

170. Due to Defendants' ardent refusals to comply with their respective obligations pursuant to the FCRA, Plaintiff was forced to obtain legal advice and counsel, for which she incurred attorney's fees.

171. Further, and due to Defendants' inexplicable refusal to block the fraudulent account(s) from an identity theft victim's consumer file, Plaintiff expended countless hours disputing the same with Defendants Equifax, Experian, Trans Union, Affirm and Uplift, repeatedly, to no avail.

172. Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately

felt utterly hopeless that Defendants would ever properly reinvestigate her disputes.

173.   At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

174.   At all times pertinent hereto, the conduct of Defendants, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

175.   Plaintiff's ongoing stress and anxiety over the situation, and after repeatedly receiving one non-responsive communication after another from Defendants, Plaintiff feels a surge of panic each time she receives another communication from Defendants.  Her ongoing stress and anxiety regarding the situation have affected her and her relationships negatively.

176.   CRA Defendants Equifax, Experian, and Trans Union have a long history of disregarding the credit reporting rights of identity theft victims under the FCRA.  For example, in the very similar matter of April Hendrix vs. Equifax, et. al., (N.CM.D. C.A. No. 1-16-cv-201), an identity theft victim sued several CRAs, including CRA Defendants Equifax, Experian, and Trans Union, over their repeated wrongful removal of security freezes, release of her credit reports for impermissible

purposes, and refusal to properly reinvestigate disputed identity theft information on her credit reports.

177.   The Hendrix suit put the Credit Bureau Defendants on notice several years ago that their respective policies and procedures for implementing security freezes and handling identity theft victims' requests and disputes were woefully inadequate.

178.   The Credit Bureau Defendants have had years of notice in the form of federal lawsuits, despite it all, the Credit Bureau Defendants did not take any better steps to protect the Plaintiff here.

179.   The respective internal policies and procedures of the Credit Bureau Defendants do not appear to place any value on its obligations under the FCRA to report credit entries accurately, to reinvestigate carefully when notified of consumer disputes, and to avoid giving third parties access to consumers' reports without authorization or permissible purpose. Nor do the Credit Bureau Defendants' respective policies and procedures respect their statutory duties to enforce or at minimum add security freezes and fraud alerts as requested by the consumer.

180.   As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the data furnishers, like Defendants Affirm and Uplift here, despite numerous court decisions admonishing this practice.  See Cushman v. Trans

Union Corp., 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); Apodaca v. Discover Fin. Servs., 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); Gorman v. Experian Info. Sols., Inc., 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

181.   The Credit Bureau Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

182.   The Credit Bureau Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

183.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; reduced overall creditworthiness; the

expenditure of time and money disputing and trying to remove derogatory accounts that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove derogatory accounts that were the product of identity theft.

184.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendants.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to**
**Assure Maximum Possible Accuracy**
**(Defendants Equifax, Experian, and Trans Union)**

185.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein.

186.   The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

187.   On numerous occasions, the Credit Bureau Defendants prepared

patently false consumer reports concerning Plaintiff.

188.   Despite actual and implied knowledge that Plaintiff was the victim of identity theft, the Credit Bureau Defendants readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by suggesting that Plaintiff had a loan account and that she was delinquent on at least one occasion.

189.   Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

190.   Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

191.   Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

192.   As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from

her good credit rating; detriment to her credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove derogatory accounts that were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove  derogatory accounts that were the product of identity theft.

193.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Credit Bureau Defendants.

194.   The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering Defendants Equifax, Experian, and Trans Union liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.   In the alternative, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

195.   Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i

## Failure to Perform a Reasonable Reinvestigation
### (Defendants Equifax, Experian, and Trans Union)

196.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

197.   The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1).  The Act imposes a 30-day limitation for the completion of such an investigation. Id.

198.   The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  See 15 U.S.C. § 1681i(a)(5)(A).

199.   On numerous occasions in 2024, Plaintiff disputed the inaccurate information with the Credit Bureau Defendants and requested that they correct and/or delete a specific item in her credit file that is patently inaccurate, misleading, and highly damaging to her, namely, the fraudulent accounts that were the product of identity theft which was a very stressful situation for the Plaintiff.

200.   Plaintiff disputed the identity theft information to the Credit Bureau Defendants several times to no avail.

201.   On at least one occasion, Plaintiff supported her dispute with a copy of

the FTC ID Theft Report and Howey-in-the-Hills police report.

202.   Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Equifax conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

203.   Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Experian conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

204.   Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Trans Union conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

205.   Plaintiff expended resources in the form of time and money to repeatedly dispute the same account with the Credit Bureau Defendants, repeatedly.

206.   The Credit Bureau Defendants' repeated refusals to block the disputed Fraudulent Account provided credibility to that account, forcing an identity theft

victim to be repeatedly confronted with the evidence of identity theft.

207.   Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

208.   Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

209.   Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain

reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

210.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove derogatory accounts that were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove derogatory accounts that were the product of identity theft.

211.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Credit Bureau Defendants.

212.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering the Credit Bureau Defendants liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.    In the alternative, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

213.   Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681c-2**
**Failure to Block Identity Theft Information**
**(Defendants Equifax, Experian and Trans Union)**

214.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

215.   Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

216.   Defendant Experian violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

217.   Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

218.   Plaintiff repeatedly submitted ample evidence of the fact that she was an identity theft victim.  Plaintiff further supported the fact that she was an identity theft victim by providing to the Credit Bureau Defendants copies of the FTC IDT Report and Howey-in-the-Hills Police Report.

219. The Credit Bureau Defendants should have blocked the identity theft information but failed to do so at every turn.

220. As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove derogatory accounts that were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove derogatory accounts that were the product of identity theft.

221. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Credit Bureau Defendants.

222. The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering the Credit Bureau Defendants liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

223.   Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**15 U.S.C. § 1681s-2b**
**Failure to Conduct an Investigation of the Disputed Information and Review of all Relevant Information Provided by the Consumer**
**(Defendants Affirm and Uplift Only)**

224.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

225.   Defendants Affirm and Uplift refused to remove information that was the product of identity theft—namely the fraudulent accounts.

226.   Defendant Affirm and Uplift violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same.

227.   As a result of Defendants Affirm and Uplift's conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove derogatory accounts that were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the derogatory accounts that were

the product of identity theft.

228.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendants Affirm and Uplift.

229.   Defendants Affirm and Uplift's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Defendants Affirm and Uplift were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

230.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants Affirm and Uplift in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief against Defendants:

(a)   Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681;

(b)    An award of actual, statutory, and punitive damages pursuant to 15 U.S.C. §§ 1681, et seq.;

(c)    An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and § 1681o; and,

(d)    Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## **JURY DEMAND**

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 3rd day of October 2024

**CONSUMER ATTORNEYS**
/*s/ Catherine Tillman*
Catherine Tillman, Esq., FL #0057663
CONSUMER ATTORNEYS
8095 N. 85th Way
Scottsdale, AZ 85258
T: (941) 263-7310
F: (718) 715-1750
E: ctillman@consumerattorneys.com

Attorneys for Plaintiff,
*Kris Marchelle Parmer*